UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WILLIAM MENEFEE**,                              Case Number 1:13 CV 134

    Plaintiff,                              Judge Sara Lioi

    v.                                       REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                              Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff William Menefee seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405 (g) and § 1383 (c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2 (b)(1). (Non-document entry dated January 18, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on July 10, 2009. (Tr. 11, 149, 154). His claims were denied initially and on reconsideration. (Tr. 84, 91, 100, 107). Plaintiff requested a hearing before an administrative law judge (ALJ). (Tr. 114). At the hearing, Plaintiff, represented by counsel, and a vocational expert (VE) testified. (Tr. 26-61). On September 19, 2011, the ALJ concluded Plaintiff was not disabled. (Tr. 8-26). Plaintiff's request for appeal was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 1481. On January 18, 2013, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

*Plaintiff's Background, Vocational Experience, and Daily Activities*

Born July 20, 1955, Plaintiff was 56 years old at the time of the ALJ hearing. (Tr. 66). He claimed hepatitis C, glaucoma, heart murmur, fatigue, mental illness, and back pain limited his ability to work. (Tr. 168, 197).

Plaintiff had a high school education, lived with his mother and step-father, and was divorced with two grown children. (Tr. 33, 171, 221, 368). Previously, he worked as a prep cook, box packer, machinist, janitor, and window assembler; and testified each position required at least moderate physical exertion. (Tr. 34-39, 368). He reported getting along well with co-workers and authority figures and cited incarceration as the reason he stopped working. (Tr. 39-40, 168, 192, 227). Although he testified he had not worked since 2002, there is some evidence Plaintiff worked in December 2008 cleaning out abandoned houses and performing construction work. (Tr. 35, 368).

With regard to activities of daily living, Plaintiff talked with his mother and helped her shop; prepared simple food; swept up leaves in the back yard; performed light housework; attended Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings and church without accompaniment; visited relatives; played chess; planted flowers; watched television; read; took public transportation; filleted fish; and maintained personal hygiene, although his mother helped him with some tasks. (Tr. 34, 46-47, 51, 186-87, 194, 222-25, 298, 331, 461, 476, 484, 537, 558, 614-15). Plaintiff testified he did not drive because he lost his license in 2002 for speeding and could not ride a bike, cut grass, walk long distances, or go places he used to go because of the pain. (Tr. 34, 47, 50, 222).

Plaintiff had a long history of alcohol and drug abuse but had been sober since October,

2

2009, the last time he used crack-cocaine. (Tr. 40-41, 369-70). Plaintiff was incarcerated several times for convictions of breaking and entering, automobile theft, carrying a concealed weapon, unauthorized use of a motor vehicle, and drug possession with subsequent community control sanctions. (Tr. 44-47, 368). While on probation in 2008, he swept a facility as part of his community service for about a week without difficulty. (Tr. 46, 49).

Plaintiff said he experienced auditory and visual hallucinations, had back and leg pain from an assault in 2006, and had difficulty establishing a normal sleep pattern. (Tr. 42-44, 51-52, 217-18, 220, 222). He was diagnosed with hepatitis C in the 1980s, but had not received any recent treatment. (Tr. 40). Plaintiff said he used a cane, glasses, eye drops, and a back brace, and claimed he could not lift more than 25 pounds, walk more than two blocks without resting, or see well. (Tr. 42, 48-49, 226-27). Plaintiff testified medication reduced his symptoms. (Tr. 42, 44, 50, 52-54).

### Medical History

On December 26, 2006, while incarcerated at Northcoast Correctional Treatment Facility (NCTF), Plaintiff had a chest x-ray, which was negative; and was immunized for influenza, hepatitis A, and hepatitis B. (Tr. 266, 279). He did not receive psychiatric treatment while incarcerated at NCTF. (Tr. 266). Plaintiff was diagnosed with hepatitis C, tuberculosis, and heart murmur. (Tr. 266).

On November 30, 2007 at Marion Correctional Institution (MCI), Plaintiff received an initial medical/mental-health/substance-use screening. (Tr. 289). He reported a history of psychotropic medication, outpatient mental health treatment, suicide attempts, hallucinations, depression, anxiety, and substance abuse. (Tr. 285, 289). Kelly Hahn, CNP, completed an addendum to the mental health evaluation where she recorded Plaintiff's complaints of

3

depression; hallucinations; paranoia; and poor appetite, energy, concentration, and sleep. (Tr. 284). She noted Plaintiff had poor eye contact; wrinkled clothes; dysphoric mood; congruent and at times bizarre affect; mumbled, quiet and at times incoherent speech; disorganized, loose, and tangential thought process; hallucinations; paranoia; poor memory; and poor insight and judgment. (Tr. 286-87). She attempted to rule out schizoaffective disorder, but Plaintiff was unable to provide history and diagnosed poly-substance dependence in full sustained remission. (Tr. 287). She also noted antisocial personality traits, hepatitis C, glaucoma, herpes, heart murmur, lumbar mass, amputation of right index finger, and assigned a global assessment of functioning (GAF) score of 50.[1] (Tr. 287).

Subsequent treatment notes from MCI indicated a decline in the frequency of auditory hallucinations; better appetite and sleep patterns, although some fatigue; medication compliance; fair eye contact; good hygiene; calm affect; and organized, linear speech. (Tr. 294, 296-99). At times Plaintiff continued to hear voices, had restrictive speech, limited insight and judgment, and poor medication compliance. (Tr. 297-98). Plaintiff was released from MCI on March 31, 2008. (Tr. 296).

On May 22, 2008, consultative examiner Eulogio R. Sioson, M.D., evaluated Plaintiff and determined he had a heart problem with no apparent significant heart murmur or overt congestive heart failure and indicated his chest pain was atypical of unclear etiology. (Tr. 324-25). Regarding back problems, Plaintiff complained of lower back pain that traveled down both

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. at 34.

4

legs, but Dr. Sioson found no apparent radiculopathy, gross deformity, or inflammatory changes in his joints, although he observed a lump in his back of unclear nature. (Tr. 325). Plaintiff reported pain as a nine (out of ten) on the pain scale, but walked normally without an assistive device and did not take any pain medication. (Tr. 324-25). Dr. Sioson indicated Plaintiff had depression and hepatitis C without clinical jaundice or signs of cirrhosis. (Tr. 325). He concluded, "[e]xcept for pain limitation . . . , neuromusculoskeletal data showed no other objective findings that would affect work-related activities such as walking, climbing, standing, carrying, lifting, handling, sitting and traveling." (Tr. 325).

On May 29, 2008, consultative examiner and psychologist Dr. Herchel Pickholtz, conducted a clinical interview and mental status evaluation. (Tr. 327). Plaintiff said his glaucoma, back pain, and fatigue prevented him from working. (Tr. 327). Dr. Pickholtz considered Plaintiff's daily activities, medical history, and work history, among other things, to conclude Plaintiff had no impairment in abilities to understand and follow instructions; maintain attention and perform simple, repetitive tasks relative to pace, consistency and reliability; or relate to others including fellow workers and supervisors. (Tr. 332). He had a mild impairment "at worse" in ability to withstand the stress and pressure associated with low-skilled and unskilled labor. (Tr. 332). Dr. Pickholtz diagnosed mixed polysubstance dependency allegedly in remission as of three years ago, schizoaffective disorder in remission with current medications, and assigned a GAF of 65.[2] (Tr. 332-33).

While incarcerated at Cuyahoga County Corrections Center (CCCC) in early 2009,

---

2. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV-TR,* at 34.

Plaintiff reported past suicide attempts, depressed mood, and auditory hallucinations telling him to watch out for others who were after his "rare blood." (Tr. 440, 446). He complained of glaucoma and his eyes appeared pink and conjunctive. (Tr. 387-88). After leaving CCCC on February 5, 2009, Plaintiff returned February 6. (Tr. 442). He reported feeling depressed and hearing voices all night since he had not been on his medication. (Tr. 385). On March 5, 2009, Plaintiff underwent an evaluation to determine whether he was competent to stand trial. (Tr. 367-74). He was found competent so long as he continued his prescribed psychiatric medications. (Tr. 374). On May 18, 2009, Plaintiff refused lab treatment because he thought the nurse had the wrong needle. (Tr. 383). He continued to hear voices in April and May, 2009 and his medications were adjusted. (Tr. 381-82).

Upon release from CCCC, Plaintiff sought treatment from Recovery Resources. (Tr. 452-53). On July 21, 2009, Recovery Resources' psychiatrist Aileen Hernandez, MD, completed a physical residual functioning capacity (RFC) report where she indicated Plaintiff's hallucinations, depression, restlessness, impulsively, depressive episodes, loss of interests, need for ongoing medications, leg and lower back injuries, and glaucoma affected his abilities to stand and walk such that he could only walk for two to three hours in an eight-hour workday or two hours without interruption. (Tr. 452-53). Plaintiff's ability to sit was unaffected but he had marked limitation in abilities to see, push/pull, bend, reach, and make repetitive foot movements. (Tr. 452). Moreover, Dr. Hernandez indicated Plaintiff could only lift six to ten pounds. (Tr. 452).

On July 28, 2009, Plaintiff went to the Care Alliance Health Center complaining of lower back pain and eye trouble and indicated he was off of his pain medications. (Tr. 455). He had decreased range of motion, and was given a prescription for ibuprofen. (Tr. 455-56).

6

On August 12, 2009, Sarah Stull, CPST, of Recovery Resources completed a daily activities questionnaire and indicated Plaintiff lived with his parents, often visited relatives, had poor comprehension skills, no income, no transportation, and a felony record. (Tr. 461). She said Plaintiff was "unsure" about matters related to his vocational history and she picked him up for appointments because he did not understand the bus system. (Tr. 461-62).

On August 18, 2009, Dr. Hernandez completed a mental status questionnaire and reported Plaintiff was neatly groomed, had good eye contact, walked with a cane, and had normal rate and volume of speech. (Tr. 458). However, she reported Plaintiff had been agitated and irritable with his family, which was unlike him; cleaned constantly; could not sit still; and heard voices. (Tr. 458). Dr. Hernandez indicated Plaintiff needed reminding to take medication and complete household chores, claimed he could not concentrate for more than four minutes, was distractible, had difficulty adjusting to change, and would react poorly to the pressures of a work setting. (Tr. 459).

On September 30, 2009, Dr. Sioson conducted a second consultative examination, where he reported Plaintiff walked normally without an assistive device even though he brought a cane, and reported his back pain was an eight (out of ten) but dropped to five with ibuprofen. (Tr. 463-64). Plaintiff's straight leg raise test was negative but he elicited back pain during range of motion testing. (Tr. 464). Dr. Sioson referenced an x-ray report from South Pointe Hospital completed the same day that suggested degenerative disc disease. (Tr. 464, 469). Dr. Sioson concluded work related activities would be impaired due to pain and limited Plaintiff to sedentary activities. (Tr. 464).

On October 27, 2009, Dr. Pickholtz completed a second clinical interview and mental status evaluation. (Tr. 472). Dr. Pickholtz indicated Plaintiff took two buses to get to the

7

examination, walked with a cane, and claimed lower back and leg problems kept him from working. (Tr. 472). Dr. Pickholtz concluded Plaintiff was mildly impaired in his abilities to understand, remember, and follow instructions; maintain attention and perform simple, repetitive tasks; relate to others; and withstand the stress and pressure associated with day-to-day work activities. (Tr. 477). He diagnosed schizoaffective disorder in remission, cocaine dependence in remission, and alcohol dependence in remission and assigned a GAF of 65.[3] (Tr. 478).

On October 27, 2009, Plaintiff was admitted to Matt Talbot for inpatient drug rehabilitation because he tested positive for cocaine while on parole. (Tr. 502). He told Dr. Hernandez Matt Talbot was very nice and he had been compliant with his medication regimen. (Tr. 502).

He was discharged from Matt Talbot on December 28, 2009. (Tr. 606). Anthony Zunt, MCDC, provided a discharge summary, indicating Plaintiff had a low degree of symptom severity, but moderate relapse potential. (Tr. 606). He assigned a GAF of 50[4], indicated Plaintiff obtained an AA/NA co-sponsor, had a good prognosis, and should find employment as soon as possible. (Tr. 606-07).

Plaintiff continued to receive treatment from Recovery Resources, generally under the care of Sarah Stull, CPST, and psychiatrist Dr. Hernandez.[5] Initially, Plaintiff reported medication side effects, noncompliance, and hallucinations. (Tr. 504-05, 554). On January 5, 2010, Plaintiff told Dr. Hernandez he ran out of medication. (Tr. 545). While off medication, the voices came back strongly and Plaintiff would lose his train of thought. (Tr. 545). He noted that

---

3. *See DSM-IV-TR, supra*, note 2.
4. *See DSM-IV-TR, supra*, note 1.
5. In 2011, Plaintiff also saw Deveta Lochan, Richard Hill, M.D., and Patricia Mack, BA, QMHD at Recovery Resources. (Tr. 617, 618, 620, 621).

he planned to see a gastroenterologist in order to have testing for hepatitis C complications. (Tr. 546).

Plaintiff told Dr. Hernandez and Ms. Stull he regularly attended AA/NA meetings, experienced a reduced number of hallucinations, and tolerated his medication well. (Tr. 537-38, 541-43, 547, 578, 581, 603, 617-18, 625). Occasionally, he reported auditory hallucinations even while on his medication, although he admitted the medication "helped". (Tr. 540, 601, 622, 624). Ms. Stull provided bus tickets for him to get to appointments and when she was no longer able to do so, offered to pick him up. (Tr. 537, 576, 603). Nevertheless, Plaintiff cited an inability to get bus fares as an excuse for missing meetings. (Tr. 576, 603). On May 28, 2010, Ms. Stull asked why Plaintiff had gained weight; he answered to take care of his mother, and Ms. Stull noted his response was confusing. (Tr. 576). On February 11, 2010, Plaintiff reported "just a little bit" of lower back pain, and indicated he did not take medication. (Tr. 540). Dr. Hernandez assigned a GAF of 48.[6] (Tr. 540, 601).

Plaintiff visited Metrohealth Medical Center several times, generally for treatment for hepatitis C and glaucoma. (Tr. 507-10, 517-25, 627-32). On November 13, 2009, and February 9, 2010, Plaintiff complained of back and knee pain, however, he had negative straight leg raise tests and normal range of motion and strength. (Tr. 512-13, 630). He was prescribed Motrin and Flexeril to cope with the pain. (Tr. 628, 631).

***State-Agency Review***

On July 23, 2008, Tasneem Khan, Ed.D., reviewed Plaintiff's records and filled out a psychiatric review technique and mental RFC. (Tr. 348, 352). Dr. Kahn concluded Plaintiff was not significantly limited, except he was moderately limited in abilities to complete a normal

workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. (Tr. 348-349). Dr. Kahn also noted Plaintiff's symptoms were controlled with medication, but he may decompensate under stress. (Tr. 350). He added Plaintiff retained the capacity to learn and perform simple and moderately complex work-like activities in an environment where work-related tasks were routine and predictable. (Tr. 350).

Dr. Kahn indicated Plaintiff had schizoaffective disorder in remission; mixed personality involving narcissistic, anti-social/additive; and polysubstance dependency in remission. (Tr. 354, 359-60). Functionally, Dr. Khan found a mild degree of limitation in activities of daily living and social functioning; moderate degree of limitation in concentration, persistence, or pace; and no episodes of decomposition of extended duration. (Tr. 362).

On November 18, 2009, Gary Hinzman, M.D., completed a physical RFC assessment and diagnosed degenerative disc disease and heart murmur. (Tr. 479). He opined Plaintiff was limited to lifting/carrying 50 pounds or less; frequently lifting/carrying 25 pounds or less; standing, walking, or sitting about six hours in an eight-hour workday; and unlimited in his ability to push and/or pull. (Tr. 480). Dr. Hinzman found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 481-83). He found Plaintiff had normal strength and noted he brought a cane to the consultative examination, "but no assistive device was required". (Tr. 481).

On April 9, 2010, Vicki Warren, Ph.D., completed a mental RFC assessment and psychiatric review technique. (Tr. 556). She found Plaintiff was not significantly limited in any area, except he was moderately limited in abilities to carry out detailed instructions, maintain

---

6. *See DSM-IV-TR*, *supra* note 1.

attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. (Tr. 556-57). She concluded Plaintiff was capable of understanding, remembering, and following task instructions; interacting with others on a superficial basis; and adapting to routine and predictable work settings. (Tr. 559).

***ALJ Decision***

The ALJ determined Plaintiff had severe impairments including degenerative disc disease, a heart murmur, schizophrenia (paranoid type), a personality disorder, and a substance addiction disorder. (Tr. 13). He further found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 14). The ALJ found Plaintiff had the RFC to perform less than a full range of medium work. (Tr. 14). Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; perform unlimited pushing and pulling; perform simple and moderately complex tasks in an environment where tasks are routine and predictable; interact with others on a superficial basis; and adapt to a routine and predictable work settings. (Tr. 14).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

11

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?
2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's RFC and can he perform past relevant work?
5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national

12

economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ failed to provide good reasons for the weight she afforded to the opinions of treating physician Dr. Hernandez; consultative examiner Dr. Sioson; and state agency reviewing physicians Drs. Khan, Warren, and Hinzman. (Doc. 15, at 5-10). Plaintiff's argument implicates the well-known treating physician rule.

### *Treating Physician Rule*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement

13

"denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id.* at 409–410.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502; 416.902. A medical provider is *not* considered a treating source if the claimant's relationship with him or her is based solely on the claimant's need to obtain a report in support of their claim for disability. §§ 404.1502; 416.902 (emphasis added). Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. §§ 404.1502;

14

416.902. This includes a consultative examiner. §§ 404.1502; 416.902.

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. §§ 404.1502; 416.902. This includes state agency physicians and psychologists. §§ 404.1502; 416.902. The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. §§ 404.1527(e)(2)(ii); 416.927.

### Dr. Hernandez

Plaintiff argues the ALJ failed to provide good reasons for affording treating physician Dr. Hernandez's opinions "little weight." (Doc. 15, at 9-10). In response, the Commissioner points out the ALJ "explained that other evidence in the record contradicted Dr. Hernandez's findings, the findings were based on non-credible evidence, and Dr. Hernandez expressed an opinion not based in her area of expertise." (Doc. 16, at 15).

On July 21, 2009, Dr. Hernandez opined Plaintiff could only walk for two to three hours in an eight-hour workday; had marked limitation in abilities to push/pull, bend, reach, make repetitive foot movements, and see; and could only lift or carry six to ten pounds. (Tr. 452-53). On August 18, 2009, Dr. Hernandez indicated Plaintiff needed reminding to take his medication and complete household chores, claimed he could not concentrate for more than four minutes, was distractible, had difficulty adjusting to changes, and would react poorly to the pressures of a work setting. (Tr. 458-59).

The ALJ afforded both of Dr. Hernandez's opinions little weight because they were

15

inconsistent with the record as a whole and appeared to rest on an assessment of impairments outside her expertise. (Tr. 17). Moreover, the ALJ stated Dr. Hernandez relied "quite heavily on the subjective reports provided by the claimant". (Tr. 17). As further discussed below, the ALJ provided good reasons for discounting Dr. Hernandez's opinions by using factors listed in 20 C.F.R. § 404.1527(d)(2), including specialization of treating source, consistency of the opinion with the record, and supportability of the opinion. Therefore, the ALJ's treatment of Dr. Hernandez's opinions did not violate the treating physician rule.

First, related to specialization of treating source, Dr. Hernandez is a psychiatrist; a fact plainly printed on her opinion. (Tr. 17, *referring to* Tr. 452). Accordingly, the ALJ discredited Dr. Hernandez's opinions regarding Plaintiff's physical capabilities as findings outside her area of expertise.

Next, the ALJ indicated Dr. Hernandez's opinions were inconsistent with the record as a whole. (Tr. 17). To this end, the ALJ relied on the opinions of Drs. Khan and Warren in formulating her RFC analysis; specifically their opinions that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and had not experienced any episodes of extended decompensation. (Tr. 16, *referring to* Tr. 362, 570). Further, the ALJ relied on Dr. Hinzman's opinion that Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk for six hours of an eight-hour workday; and could perform unlimited pushing and pulling. (Tr. 17, *referring to* Tr. 480-83). The ALJ also considered Dr. Pickholtz's opinions, which indicated Plaintiff had either no impairments or mild impairments in abilities to understand and follow directions; relate to others; maintain attention to perform

16

simple, repetitive tasks; and withstand the stress and pressures associated with low skilled and unskilled labor. (Tr. 17, *referring to* Tr. 332-33, 477-78). Similarly, the ALJ relied on Dr. Warren's opinion that Plaintiff was capable of understanding, remembering, and following task instructions and could adapt to a routine and predictable work setting. (Tr. 16, *referring to* Tr. 558-59). In sum, by considering no less than five opinions in her RFC determination, the ALJ properly explained her assertion that Dr. Hernandez's opinions were inconsistent with the record as a whole.

Last, the ALJ challenged the supportability of Dr. Hernandez's opinions because they were based on Plaintiff's subjective complaints, rather than objective testing.  To that end, the ALJ found Plaintiff's subjective complaints not credible to the extent they conflicted with the RFC. (Tr. 15).

With regard to Plaintiff's credibility, the ALJ cited Plaintiff's complaints of severe back pain without objective findings to support his claims. (Tr. 15). The ALJ said that although lumbar spine x-rays revealed degenerative disc disease, corresponding exam findings failed to establish the clinical significance of the condition. (Tr. 16, *referring to* Tr. 469). Furthermore, while some examiners noted decreased range of motion and positive straight leg raise tests, many found a lack of sensory deficits or muscle weakness, negative straight leg raise tests, normal range of motion, and normal gait. (Tr. 16, *referring to* Tr. 320-23, 464, 480-81, 513, 630).

The ALJ also pointed to Plaintiff's claim that he needed a cane for ambulation, while treatment notes indicated he did not. (Tr. 16, *referring to* Tr. 325, 464, 481). The ALJ described further inconsistencies in Plaintiff's claims of debilitating pain evidenced by minimal treatment for back pain, such as Motrin and Naproxen. (Tr. 16, *referring to* Tr. 512, 628, 631). Lastly, the

17

ALJ indicated Plaintiff performed some type of work after his alleged onset date, and although he said he could not care for his mother, he later admitted to Ms. Stull that the reason he gained weight was to take care of his mother. (Tr. 16, *referring to* 576, 603).

Regarding psychological impairments, objective findings are also inconsistent with his complaints. The ALJ identified Plaintiff's inconsistent mood, thought process, and judgment (Tr. 16, *referring to* Tr. 281, 286-87, 296, 440, 446) and noted his overall presentation and wide ranging GAF scores (Tr. 16, *referring to* Tr. 287, 540, 601, 606, 618, 622, 625). Moreover, the ALJ pointed out Plaintiff's noncompliance with his medication regimen and participation in a counseling program, and claims that he could not get to appointments because he did not have transportation. (Tr. 16, *referring to* Tr. 297, 576, 603). Accordingly, the ALJ thoroughly challenged the credibility of Plaintiff's complaints, and thereby the supportability of Dr. Hernandez's opinions.

In sum, the ALJ provided good reasons to afford Dr. Hernandez's opinions little weight based on her specialty as a psychiatrist, the record as a whole, and foundation of Plaintiff's subjective complaints.

### *Dr. Sioson*

Next, Plaintiff argues the ALJ erred by not providing good reasons for affording consultative examiner Dr. Sioson's May 2008 opinion "some weight" and September 2009 opinion "little weight." (Doc. 15, at 7-9). In response, the Commissioner argues the ALJ properly discussed inconsistency with the record and lack of supportability. (Doc. 16, at 13).

On May 22, 2008, Dr. Sioson found Plaintiff's work-related activities were objectively unaffected. (Tr. 324-25). On September 30, 2009, Dr. Sioson reported a negative straight leg

raise test, some pain during range of motion testing, and limited Plaintiff to sedentary activities. (Tr. 463-64).

Because Dr. Sioson's May 2008 opinion suggested Plaintiff had some pain-related limitations, but did not specifically identify any limitations, the ALJ afforded the opinion "some weight". (Tr. 17). She afforded "little weight" to Dr. Sioson's September 2009 opinion because it was inconsistent with the record. (Tr. 18). For the following reasons, the ALJ considered factors contemplated by 20 C.F.R. § 404.1527(d)(2) as part of her assignment of weight to Dr. Sioson's opinions, including consistency of the opinions with the record as a whole and supportability of the opinions. *See Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, at 823-24 (S.D. Ohio 2011) ("Opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.").

Indeed, the ALJ challenged the supportability of Dr. Sioson's May 2009 opinion.  Dr. Sioson opined, "except for pain limitation . . . , neuromusculoskeletal data showed no other objective findings that would affect work related activities such as walking, climbing, carrying, lifting, handling, sitting, and traveling." (Tr. 17, *referring to* Tr. 325). As the ALJ pointed out, any limitations imposed by the opinion were not specifically described by the opinion and were unsupported by the doctor's own findings, including normal strength and gait. (Tr. 17, *referring to* Tr. 325). Accordingly, the ALJ challenged the supportability of Dr. Sioson's May 2009 opinion.

Moreover, the ALJ found Dr. Sioson's September 2009 opinion, which limited Plaintiff to sedentary activities, inconsistent with the record as a whole. (Tr. 18). As support, the ALJ

19

indicated Plaintiff worked as a porter while imprisoned and after release, took care of his mother and mowed lawns for extra cash. (Tr. 18, *referring to* Tr. 346, 576, 603). Although Plaintiff suggests this evidence is taken out of context, the ALJ's finding that Plaintiff is capable of more than sedentary work is supported by substantial evidence. (Doc. 15, at 8-9).

Indeed, the majority of physicians did not limit Plaintiff to sedentary work. Although Dr. Hernandez limited Plaintiff to work which required walking for less than two-to-three hours in an eight-hour workday, lifting/carrying six to eight pounds, and indicated he had marked limitation in abilities to push/pull, bend, reach, see, and make repetitive foot movements, the ALJ afforded that opinion little weight for the reasons discussed above. (Tr. 452-53). Moreover, objective strength testing consistently revealed Plaintiff was minimally limited with regard to physical capabilities, including negative straight leg testing and normal strength and range of motion. (Tr. 320-23, 464, 480-81, 513, 630). Furthermore, the record indicates Plaintiff performed light house work, swept the yard, shopped, independently used public transportation, and ambulated effectively without a cane. (Tr. 34, 49, 186, 222, 224, 325, 331, 463-64, 472, 476, 481, 484).

The record also shows Plaintiff received minimal treatment for his alleged physical impairments. To this end, in 2008, Plaintiff claimed his back pain as a nine (out of ten) on the pain scale, but he walked normally without an assistive device and did not take pain medication. (Tr. 324). Plaintiff was prescribed anti-inflammatory drugs such as Naproxen and Motrin to address his back and leg pain, which he said were effective. (Tr. 512, 631). In sum, the ALJ's finding that Plaintiff is capable of more than sedentary work is supported by substantial evidence.

In conclusion, by finding Dr. Sioson's opinions internally unsupported and inconsistent with the record as a whole, the ALJ provided good reasons to afford his opinions less than controlling weight.

**State Agency Examiners, Drs. Khan, Warren, and Hinzman**

Last, Plaintiff argues the ALJ did not provide good reasons for affording the opinions of state agency reviewing physicians Drs. Khan, Warren, and Hinzman great weight. (Doc. 15, at 7). Again, "[o]pinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F. Supp. 2d at 823-24.

Here, the ALJ gave great weight to Drs. Khan, Warren, and Hinzman because their opinions were well supported by the record. (Tr. 16-17). As more fully discussed above, the ALJ's analysis of Plaintiff's activities of daily living; objective evidence; credibility; treatment regimen; and treatment records and notes constituted good reasons and the ALJ's conclusion is supported by substantial evidence. *See, Hoskins v. Comm'r of Soc. Sec*., 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by substantial evidence.").

Indeed, when formulating her RFC, the ALJ noted Plaintiff maintained personal hygiene, cared for his mother, watched television for hours, understood and remembered what he watched, played chess, read the bible, socialized with his family, and attended AA meetings. (Tr. 34, 46-47, 51, 186-87, 194, 222-25, 298, 331, 461, 476, 484, 537, 558, 614-15). Therefore, the ALJ found he had less than moderate difficulty in activities of daily living. (Tr. 14).

With respect to objective evidence, the ALJ found a lack of corresponding exam findings

21

to support a finding of degenerative disc disease. (Tr. 15). In fact, the ALJ indicated several examiners noted normal range of motion, normal gait, and negative straight leg raise testing. (Tr. 15, *referring to* Tr. 320-23, 464, 480-81, 513, 630). As explained above, there was substantial evidence to find Plaintiff was capable of more than sedentary work.

Psychologically, the ALJ found inconsistent treatment notes regarding Plaintiff's mood, thought process, and judgment. (Tr. 16, *referring to* Tr. 281, 286-87, 296, 440, 446). Similarly, Plaintiff's GAF scores ranged from 48, indicating serious symptoms, to 65, indicating mild symptomatology. (*Id.*).

Regarding credibility, the ALJ noted Plaintiff's claim that he required a cane to ambulate. (Tr. 15). However, she found his statement less than credible because he also admitted he only experienced "a little bit" of back pain and did not take medication. (Tr. 15-16, *referring to* Tr. 540). Furthermore, several treatment notes indicated Plaintiff did not need a cane to ambulate normally. (Tr. 15-16, *referring to* Tr. 325, 464, 481). Moreover, the ALJ concluded his complaints did not correlate with objective testing, treatment history, physical examinations, and compliance with treatment because he was treated conservatively and provided conflicting evidence regarding his activities since the alleged onset date of his disability. (Tr. 15-16). The ALJ also considered contradictory evidence related to Plaintiff's claims that he could not use public transportation, take care of his mother, or do physical work. (Tr. 16, *referring to* Tr. 346, 576, 603).

With regard to treatment regimen, Plaintiff had only treated with Naproxen and Motrin, both non-steroidal anti-inflammatory drugs, and had not attempted more aggressive treatment protocols. (Tr. 16, *referring to* Tr. 512, 631).

As mentioned above, the ALJ considered the treatment notes and records of Drs. Sioson, Hernandez, and Pickholtz. Additionally, she considered Ms. Stull's opinion that Plaintiff could not figure out the bus system, but discredited the finding as inconsistent with her own treatment notes and unsupported by the evidence. (Tr. 18, *referring to* Tr. 461-62). The ALJ also considered Plaintiff's mother's third party function report, but afforded it little weight due to her close relationship with the claimant and vested interest in the outcome of the case. (Tr. 18, *referring to* Tr. 186-93).

Accordingly, the ALJ's RFC is supported by substantial evidence, and she provided good reasons to afford Drs. Khan, Warren, and Hinzman greater weight because their opinions were consistent with the record as a whole.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).